# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

EDWARD E. SYROVY, JR.,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C07-2071

ORDER ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    **PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . . 2

III.   **PRINCIPLES OF REVIEW** . . . . . . . . . . . . . . . . . . . . . 3

IV.   **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     A.    *Syrovy's Education and Employment Background* . . . . . . . . . . . . 4
     B.    *Testimony from the Administrative Hearing held on July 19, 2006* . . . 4
          1.   *Syrovy's Testimony* . . . . . . . . . . . . . . . . . . . . . . 4
          2.   *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . 6
     C.    *Testimony from Supplemental Administrative Hearing held on October 23, 2006* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          1.   *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . 8
          2.   *Susan Syrovy's Testimony* . . . . . . . . . . . . . . . . . . . 9
     D.    *Syrovy's Medical History* . . . . . . . . . . . . . . . . . . . . . . . 9

V.     **CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . 22
     A.    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . 22
     B.    *Whether the ALJ Properly Considered the Evidence* . . . . . . . . . . 23
          1.   *Dr. Janda's Opinions* . . . . . . . . . . . . . . . . . . . . . 24
          2.   *The ALJ's Hypothetical Questions* . . . . . . . . . . . . . . . 27
          3.   *Substantial Gainful Employment* . . . . . . . . . . . . . . . . 28

VI.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VII.  **ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Edward E. Syrovy on October 30, 2007, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Syrovy asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits.

## II. PRIOR PROCEEDINGS

On May 3, 2004, Syrovy applied for both disability insurance benefits and SSI benefits.[1] In his application for disability insurance benefits, Syrovy alleged an inability to work since January 1, 1997, due to an anxiety disorder and post traumatic distress disorder. In his application for SSI benefits, Syrovy alleged an inability to work since March 11, 2004. Both applications were denied on September 21, 2004. On December 27, 2004, the applications were denied on reconsideration. On January 15, 2005, Syrovy requested an administrative hearing before an Administrative Law Judge ("ALJ"). On July 19, 2006, Syrovy appeared with counsel, via video conference, before ALJ George Gaffaney. Syrovy and vocational expert Vanessa May testified at the hearing. A supplemental hearing was held via video conference on October 23, 2006. Sue Syrovy, Syrovy's former spouse, and vocational expert Vanessa May testified at the supplemental hearing. In a decision dated April 18, 2007, the ALJ denied Syrovy's claim. The ALJ determined that Syrovy was not disabled and not entitled to disability insurance benefits and SSI benefits because he was functionally capable of performing work that exists in significant numbers in the national economy. Syrovy appealed the ALJ's decision. On September 23, 2007, the Appeals Council denied Syrovy's request for review.

---

[1] The record indicates that Syrovy first applied for disability insurance benefits and SSI benefits on April 12, 2001. The application for SSI benefits was denied on July 19, 2001. The record contains no further information regarding either application.

Consequently, the ALJ's April 18, 2007 decision was adopted as the Commissioner's final decision.

On October 30, 2007, Syrovy filed this action for judicial review. The Commissioner filed an answer on January 11, 2008. On February 7, 2008, Syrovy filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that there is other work he can perform. On April 7, 2008, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. Syrovy filed a reply brief on April 14, 2008. On December 19, 2007, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." Id.

The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005) (citing Harris v. Barnhart, 356 F.3d 926, 928 (8th Cir. 2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. Id. (citing Sultan v. Barnhart, 368 F.3d 857, 862 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an

3

administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester*, 416 F.3d at 889 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams*, 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).

## IV. FACTS

### A. Syrovy's Education and Employment Background

Syrovy was born in 1968. He completed the eleventh grade in high school. He was enrolled in special education classes from grade school through high school. At the hearing, he testified that he "had a hard time in school" and was in "[s]pecial [e]d[ucation] all the way through school."[2] He has earned a GED.

The record contains a detailed earnings report for Syrovy. The earnings report provides that Syrovy had sporadic employment between 1987 and 2005. According to the report, Syrovy earned as little as $30.00 total in 1997 and as much as $5,267.97 total in 1999. He had no earnings in 2006.

### B. Testimony from the Administrative Hearing held on July 19, 2006

### 1. Syrovy's Testimony

At the administrative hearing, Syrovy's attorney asked Syrovy to describe his difficulty with panic attacks. Syrovy testified that he began having panic attacks in 1997.

------

[2] *See* Administrative Record at 502.

According to Syrovy, the panic attacks occur three to four times each week. He explained that the panic attacks feel like mini-heart attacks, and include heart palpitations, sweating, tingling, and chest pains. The panic attacks last twenty to thirty minutes. When asked how the panic attacks affect his ability to work, Syrovy responded:

> A:  [When I have a panic attack,] I just want to be in a room by myself and try to -- I don't want to be nobody. I don't -- I'm afraid no one's going to know what to do if I actually go into one.
>
> Q:  Are there other reasons why you can't work? Have you become physically weak or -- what happens to you physically when you have these attacks?
>
> A:  I just shut down, you know. I just don't have any concentration or nothing. It's just like I'm in a blank.
>
> Q:  Can you predict when they're going to happen?
>
> A:  No, I don't. A lot of times it's at night in the middle of the night. I'll wake right up into one and during the day, I could be just sitting there and I could just go into one. I don't know when they're going to come. It just scares you.

(Administrative Record at 504-05.) Syrovy testified that he was taking Klonopin as treatment for the panic attacks. He indicated that the medication did not consistently help him.

Syrovy also testified that he doesn't like being around people. Specifically, he testified that he didn't like going to the "grocery store or Wal-Mart or anything like that. I can't go in there. When I was living with my ex-wife, I always sat out in the car, I never went in."[3] Syrovy further explained that he isolates himself from other people and sits alone in his room at least once every other day. Syrovy's attorney asked Syrovy whether his difficulty being around people or his need to isolate himself from others caused any problems with his co-workers. Syrovy answered:

> A:  Yes, because I always feel like I'm being watched and I get nervous because I always think someone's looking

---

[3] *See* Administrative Record at 506.

> over my shoulder trying -- making sure I do the right
> thing, you know. . . .

(Administrative Record at 506.) Syrovy also testified that he has memory problems. For example, he testified that " . . . if someone tells me to do something a day before, I'll forget about it. I won't know what they said the next day, or a lot of times I, I miss doctor's appointments because I don't -- I forget what days they're on."[4]

Lastly, Syrovy's attorney asked Syrovy to describe his typical day. According to Syrovy, a typical day was "more or less staying around the house." Specifically, he testified that he could do the laundry and "easy stuff," but did not cook very much.

The ALJ also questioned Syrovy. Specifically, the ALJ asked him about his physical limitations. According to Syrovy, he cannot "strain" with his left arm because it causes pain in his face.[5] Syrovy also testified that he becomes dizzy from standing for any period of time. He attributed the dizziness to his anxiety and panic disorder. He also indicated that he does not like big crowds and has problems talking to people because he does not know what to say to people. Lastly, when asked why he is unable to work full-time, Syrovy responded "I can't, can't be around a crowd. If I'm around a crowd, I get all nerved up. Just, I mean, functioning, comprehension and -- I have to be told over and over a lot of things, you know. So I get things right."[6]

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who would be limited to working at "simple routine tasks with occasional changes in a routine work setting and occasional independent decisions, and just occasional production rate pace, . . . and only occasional interaction with the

---

[4] See Administrative Record at 518.

[5] Syrovy had facial fractures which caused nerve damage in his face. The left side of his face is numb from the eyelid down to his lower lip.

[6] See Administrative Record at 501.

public."[7]  The vocational expert testified that under such limitations, Syrovy could perform work as a seed cutter (1,500 positions in Iowa and 240,000 positions in the nation), trimmer (13,000 positions in Iowa and 882,000 positions in the nation), and window cleaner (24,000 positions in Iowa and 2,100,000 positions in the nation).  The ALJ provided the vocational expert with a second hypothetical with the same limitations, except that the individual would miss one day of work per month due to panic attacks.  The vocational expert testified that the individual could perform the jobs described under the first hypothetical.  The ALJ provided a third hypothetical which limited the individual to "simple routine work, no changes in routine work setting, no independent decisions, no interaction with the public and just occasional interaction with coworker's and supervisors, and again, just occasional production rate pace."[8]  Again, the vocational expert testified that the individual could perform the jobs described under the first hypothetical.  In his fourth hypothetical, the ALJ provided the same limitations as the third hypothetical, except that the individual would be limited to sedentary work.  According to the vocational expert, under such limitations, Syrovy could perform work as a sorter (4,500 positions in Iowa and 495,000 positions in the nation), addresser (1,800 positions in Iowa and 168,000 positions in the nation), and preparer (34,000 positions in Iowa and 2,900,000 positions in the nation).  The ALJ's final hypothetical had the same limitations as the third hypothetical, except that the individual would be unable to sustain an eight-hour workday.  The vocational expert testified that under such limitations, Syrovy could not perform any full-time competitive job in the national economy.

Syrovy's attorney also questioned the vocational expert.  Syrovy's attorney asked the vocational expert the following questions:

> ATTY:  I would like to have you assume that the -- in addition to the facts set forth by the Administrative Law Judge in his hypothetical

---

[7] *See* Administrative Record at 520.

[8] *Id.* at 521.

| | three that the person would have unexpected panic attacks one to three a week that could interfere with his work. |
|---|---|
| ALJ: | So it -- |
| ATTY: | Are there any jobs available under those circumstances? |
| ALJ: | Well, let, let's see if we can quantify it. So what you're saying then would be up to three unscheduled rest breaks per week of how much duration? Are you talking the twenty minute the attack . . . or some additional time after? |
| ATTY: | Half hour. |
| ALJ: | Okay. So three unscheduled rest breaks per week of 30 minutes, is that what you're aiming at? |
| ATTY: | Right. . . . |
| VE: | If this would be beyond the regular breaks -- if it's one to three per week then that would be most of the week so I would say that competitive employment would be problematic under that hypothetical. . . . |
| ATTY: | Well, how about if we just say even once a week he's not available. |
| ALJ: | For thirty minutes? |
| ATTY: | For thirty minutes unexpectedly. That's my point. |
| ALJ: | Okay. |
| VE: | Once a week, I -- it could become problematic but again, I don't believe that that would necessarily preclude competitive employment. |

(Administrative Record 523-25.)

### C. *Testimony from Supplemental Administrative Hearing held on October 23, 2006*

#### 1. *Vocational Expert's Testimony*

At the supplemental hearing, Syrovy's attorney asked vocational expert Vanessa May further questions that he was unable to ask at the initial hearing. First, Syrovy's attorney asked the vocational expert whether an individual was employable if he or she could not perform simple tasks for one hour and twenty minutes three days per week. The vocational expert testified that under such circumstances, Syrovy could not perform any

full-time competitive job in the national economy. When asked whether an individual who could not work at a pace of being able to do simple repetitive tasks a third of the time was employable, the vocational expert replied that such a limitation would preclude competitive full-time employment. Syrovy's attorney also asked the vocational expert whether an individual would be employable if he or she could only occasionally understand, remember, and carry out simple instructions. The vocation expert testified that such an individual would not be employable. Lastly, Syrovy's attorney asked whether having no contact with anyone occasionally or up to a third of the time would preclude employment. The vocational expert testified that there would be no full-time employment for such an individual.

### 2. Susan Syrovy's Testimony

Susan Syrovy ("Susan") is Syrovy's former wife. At the supplemental hearing, Susan testified that " . . . I'm divorced from [Syrovy] right now . . . I lived with him for many years and stuff, and I, I saw him going into panic attacks and stuff, and he would break out with a sweat, and his heartbeat would be going faster and everything. He'd want to be alone more or less."[9] According to Susan, on a few occasions, when Syrovy had a panic attack, he went to the emergency room because he was scared he was having a heart attack. Susan also described Syrovy as having "mood swings, and, and he'd want to be alone a lot or he'd want to sleep because he, he would want to try to come out of the anxiety attacks."[10]

### D. Syrovy's Medical History

Syrovy was first diagnosed with panic disorder and generalized agoraphobia in 1996. On April 23, 1996, Syrovy visited Dr. Clay Hallberg, D.O. On the day before his visit, Syrovy had an episode where he felt short of breath, had palpitations, and had a feeling of "impending doom." After diagnosing him with panic disorder and agoraphobia,

---

[9] See Administrative Record at 541-42.

[10] Id. at 543.

Dr. Hallberg prescribed Amitriptyline as treatment. Syrovy had a follow-up visit with Dr. Hallberg on May 7, 1996. Dr. Hallberg noted that Syrovy tolerated the Amitriptyline and his palpitations, feelings of dread, nausea, and panic attacks were reduced by fifty to seventy-five percent. Dr. Hallberg also found that Syrovy's attacks were "less frequent and less intense" after starting the medication. Dr. Hallberg recommended that Syrovy continue taking Amitriptyline and increased the dosage as treatment. Syrovy continued to see Dr. Hallberg and his associates for his panic attack disorder from May 1996 through November 1997. During this time period, Syrovy was treated with medication.

On January 13, 1998, Syrovy was evaluated by Drs. Khalil M. Saliba, M.D., and Rosario Rodriguez, M.D., at the University of Iowa Hospitals and Clinics ("UIHC"). Syrovy informed Drs. Saliba and Rodriguez that he had feelings of tiredness, low mood, poor appetite, poor concentration, and difficulty sleeping. Syrovy also complained of having three panic attacks per week which lasted from three to ten minutes, social phobia, and being panicky in crowds. Drs. Saliba and Rodriguez diagnosed Syrovy with panic disorder (with social phobia). Drs. Saliba and Rodriguez recommended a gradual increase of Imipramine from 50 mg every week to 150 mg per week as treatment.

On February 19, 1998, Syrovy was evaluated by Dr. Deema A. Fattal, M.D., at the UIHC Neurology Clinic. Dr. Fattal diagnosed Syrovy with panic attacks with agoraphobia, severe generalized anxiety, hypochondriasis, and somatization. Dr. Fattal also noted that Syrovy had been complaining of decreased memory, feeling "down," decreased sleep, and decreased appetite and weight. Dr. Fattal further noted that Syrovy suffered from throbbing headaches every other day, pressure pains in his head and chest, and tingling in his arms and fingers when he was anxious. Lastly, Dr. Fattal noted that Syrovy took Xanax for his panic disorder, and that the medication helped his symptoms. Syrovy continued, however, to have three episodes of panic attacks each week. Upon examination, Dr. Fattal found:

> [Syrovy] exhibits . . . very soft neurological signs that are seen
> in patients with attention deficit and other neuroses. He had
> a neuropsychological evaluation performed at this visit, and his

> performance was consistently within the average range. He
> had no deficits in any area. He scored extremely high anxiety
> level on the Becker scale.

(Administrative Record at 268.) Dr. Fattal recommended behavioral modification through the Psychiatry Clinic as treatment.

On May 15, 1998, Syrovy met with Dr. Anusha Ranganathan, M.D., at the UIHC Psychiatry Clinic. Dr. Ranganathan noted that Syrovy had improvements in his panic attacks after changing medications from Imipramine to Luvox. Specifically, Syrovy informed Dr. Ranganathan that his panic attacks "have not been as frequent or as intense as they were before."[11] Dr. Ranganathan also noted that Syrovy had sleep problems, including initial and middle insomnia. Syrovy's sleep problems also caused his energy to be down. Dr. Ranganathan diagnosed Syrovy with panic disorder (with social phobia). Dr. Ranganathan recommended that Syrovy continue Xanax and Luvox as treatment. Dr. Ranganathan also urged Syrovy to "stay within the amount of medications prescribed and not to overuse the medication that is given to him."[12]

On March 16, 2000, Syrovy presented at the UIHC Psychiatry Clinic for re-evaluation of his panic disorder. Syrovy met with Sarah Clarke ("Clarke"), a physician's assistant in the Psychiatry Clinic. Syrovy informed Clarke that he had two to three panic attacks per week. Syrovy described his panic attacks in the following manner:

> [The p]anic attacks consist of gradual onset of light
> headedness, blurred vision, palpitations, shortness of breath,
> diaphoresis, shakiness, and fear of dying. Attacks may occur
> in any situation, but are more likely to occur at work or in
> crowded settings such as grocery stores. Attacks may last
> anywhere from 10 minutes to 1 hour.

(Administrative Record at 272.) Syrovy also complained of difficulties with concentration. He attributed his difficulties to anxiety. Clarke noted that at his last visit to the clinic, in May 1998, Syrovy reported a good response to treatment with Luvox. However,

---

[11] *See* Administrative Record at 270.

[12] *Id.*

according to Syrovy, he stopped taking the Luvox one month after his 1998 visit because "it wasn't working." Clarke diagnosed Syrovy with panic disorder with agoraphobia, somatization disorder, and dependent traits. Clarke recommended Klonopin and Remeron as treatment.

On April 10, 2000, Syrovy had a follow-up visit with Clarke. He reported "complete resolution of panic symptoms since transitioning from Xanax to Klonopin. He reports excellent sleep, good energy, good mood, good concentration, and a 'whole new attitude.'"[13] Syrovy also indicated that his somatic symptoms were resolved. He reported that he was no longer concerned that he was having heart problems, hypertension, diabetes, or cancer. Clarke recommended that he continue his medications and prescribed Clonazepam as treatment.

On March 29, 2001, Syrovy met with Deb Pantini, M.A. ("Pantini"), at the Backbone Area Counseling Center in Manchester, Iowa, for a clinical evaluation. Syrovy informed Pantini that he suffered from panic attacks and anxiety in social situations. Syrovy indicated that he had one panic attack per week which lasted five to fifteen minutes. Pantini noted, however, that Syrovy's most recent panic attack occurred one month prior to his visit. According to Syrovy, his panic attacks resulted in sweating, heart racing, and thoughts of dying. Pantini also noted that:

> [Syrovy] described himself as paranoid. He states that he is always thinking that others are watching him. [He] describes that when he is at home he is always getting up to look out the window to see if someone is there. [He] describes hearing voices when he is sleeping, though not every night. [He] describes that sound as like [a] siren or screaming noise. He states that he has heard this screaming only on a few occasions when he has been awake. [He] also describes a visual hallucination in the form of seeing a white dot going across his vision. [Syrovy] states that he then experiences some blurred vision and often ends with a headache. [He] states that this occurs approximately one time every 2-3 weeks. . . . He has

---

[13] *See* Administrative Record at 275.

a fear of having panic attacks in front of others, such as in a
store and no one will know what to do.

(Administrative Record at 283.)  Pantini diagnosed Syrovy with panic disorder with

agoraphobia.  Pantini recommended individual counseling along with psychiatric care for

treatment.

On March 30, 2001, Syrovy "presented emergently for medication refills" at the

UIHC Psychiatry Clinic.  Dr. David Flaherty, D.O., noted that:

> [Syrovy] states that Klonopin is working fairly well to improve
> his panic symptoms.  He continues to have 3-4 panic attacks
> per month but has noticed a decrease in frequency and
> magnitude of attacks since switching over to Klonopin.  [He]
> reports he continues to have significant anxiety throughout the
> day which worsens when he is in social situations. . . . [He]
> reports mild difficulties with initial insomnia.  He states his
> energy level, memory, concentration, and appetite are all at
> baseline.

(Administrative Record at 277.)  Dr. Flaherty recommended that Syrovy continue taking

Klonopin as treatment, and provided Syrovy with a prescription to re-fill the Klonopin.

Dr. Flaherty also prescribed Celexa on a trial basis for further treatment.

On May 4, 2001, Syrovy met with Dr. Alan C. Whitters, M.D., for evaluation of

his panic disorder.  Dr. Whitters noted that Syrovy's panic attacks were "quite variable,

occurring about one time per week and associated with diaphoresis, palpitations and

thoughts that he is dying."[14]  Syrovy informed Dr. Whitters that his panic attacks usually

occurred when he was around a large number of people.  Dr. Whitters noted that Syrovy

felt that his panic attacks prevented him from working.  Upon examination, Dr. Whitters

found that Syrovy had a lot of problems with anxiety and seemed "somewhat schizoid"

because he wanted to be isolated from people.  Dr. Whitters recommended Effexor XR as

treatment.

---

[14] *See* Administrative Record at 286.

On June 15, 2001, Syrovy was referred by Disability Determination Services ("DDS") to the Gannon Mental Health Center in Dubuque, Iowa, for psychological testing. Syrovy was evaluated by Dr. Keith Gibson, Ph.D. Dr. Gibson noted that on a typical day Syrovy gets up:

> usually between 7:00 [a.m.] and 9:00 [a.m]. He does not eat breakfast. He watches television, usually the weather channel. He helps with housecleaning, takes care of the yard, and cooks occasionally. . . . He tries to socialize with friends, but becomes very suspicious and uncomfortable, even around people with whom he has frequent contact. He often asks them "What did I do?" They reassure him readily that he has done nothing wrong, but he continues to experience a very high level of social discomfort. He will visit neighbors with his girlfriend, but on these occasions will sit in the corner and start shaking. He stays home mainly, and will not go out unless he is accompanied by an acquaintance. When people come over to visit he usually will go into the kitchen, or isolate in his bedroom. He is usually in bed by between 10:00 [p.m.] and 11:30 [p.m.] at night.

(Administrative Record at 289-90.) Dr. Gibson administered the WAIS-III test to Syrovy. On the test, Syrovy obtained a Verbal IQ score of 70, a Performance IQ score of 69, and a Full-Scale IQ score of 67. Based on these scores, Dr. Gibson determined that Syrovy's functioning was in the mild mental retardation range of intellectual abilities. Dr. Gibson noted that Syrovy's "intellectual functioning suggests that vocational options may be somewhat limited. Individuals with similar intellectual abilities usually do best with concrete, repetitive tasks, and usually require a moderate amount of supervision, particularly when learning new job skills."[15] Dr. Gibson diagnosed Syrovy with panic disorder with agoraphobia and mild mental retardation. Dr. Gibson concluded that:

> [Syrovy] retains capacity to remember and understand simple instructions, procedures, and locations. Because of the persistence of social discomfort and anxiety symptoms in social situations, he would have difficulty carrying out

---

[15] *See* Administrative Record at 291.

instructions. Maintenance of attention, concentration, and pace in a work environment would be difficult for him. The most debilitating aspect of his symptom picture is his social dysfunctioning. Appropriate interactions with strangers in a work setting are problematic for him. He would have great difficulty in this area because of the high level of persistent anxiety symptoms triggered by social situations. Flexibility and adaptability in a work environment would be very difficult for him.

(Administrative Record at 292.)

On July 19, 2001, Dr. Dee E. Wright, Ph.D., reviewed Syrovy's medical records and provided DDS with a Psychiatric Review Technique assessment and a mental residual functional capacity ("RFC") assessment for Syrovy. On the Psychiatric Review Technique assessment, Dr. Wright diagnosed Syrovy with panic disorder with agoraphobia, somatization disorder, and dependent traits. Dr. Wright determined that Syrovy had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Wright determined that Syrovy was moderately limited in his ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. Dr. Wright also called into question Syrovy's performance on the WAIS-III test administered by Dr. Gibson. Specifically, Dr. Wright noted:

Interestingly, [Syrovy's] performance on the WAIS-III yielded a verbal IQ score of 70, a performance IQ score of 69, and a full scale IQ score of 67. The psychologist felt [Syrovy] was functioning in the mild range of mental retardation and exhibited symptoms consistent with a Panic disorder with

agoraphobia. The psychologist did not have prior evidence in the file concerning [Syrovy's] previous history and testing performed by the UIHC.

Because of the inconsistency between [Syrovy's] history and his current IQ scores, this reviewing psychologist recommended the DDSB examiner contact [Syrovy's] treating psychiatrist. The DDSB examiner did contact [Syrovy's] treating psychiatrist on 7/16/2001. The examiner reported that the treating psychiatrist did not believe [Syrovy] was mentally retarded. The psychiatrist noted he was suspicious of the scores on the recent IQ test falling under 70. . . .

The preponderance of the evidence in [the] file raises questions about [Syrovy's] performance during the most recent psychological evaluation. [Syrovy's] history does not indicate evidence of mental retardation and, in fact, indicates that [Syrovy] function[s at] a much higher level.

(Administrative Record at 309-10.) Dr. Wright concluded that Syrovy had moderate cognitive restrictions of function and difficulty with attention and concentration when he is unduly stressed. Despite such a restriction, Dr. Wright determined that Syrovy was capable of sustaining "sufficient concentration and attention to perform non[-]complex, repetitive, and routine cognitive activity when he is interested/motivated to do so."[16] Dr. Wright also found restrictions of social function when he is unduly stressed. Again, despite such a restriction, Dr. Wright determined that Syrovy was capable of sustaining "short-lived, superficial interaction with others in appropriate ways when he is interested/motivated to do so."[17]

One of Syrovy's treating physicians, Dr. Jerry Janda, D.O., provided a "Physician's Statement" for the Iowa Department of Human Services' Child Support Recovery Unit regarding whether Syrovy had a physical or mental impairment which made him "incapable of performing, for wage or profit, the material and substantial duties of any

---

[16] *See* Administrative Record at 310.

[17] *Id.*

16

job."[18] Dr. Janda opined that Syrovy was incapable of performing the material and substantial duties of any job. Dr. Janda stated that Syrovy had been incapacitated since 1997 with severe panic attacks and was permanently disabled and unable to maintain a full-time job.

On July 20, 2004, Syrovy underwent a psychological evaluation conducted by Dr. Glenn F. Haban, Ph.D. Dr. Haban summarized Syrovy's medical history as follows:

> . . . [Syrovy] feels his ability to work is frustrated by his emotional difficulties, especially feeling anxious around other people. . . .
>
> Syrovy's medical history includes an assault about 5 months ago that resulted in 5 facial fractures, vision problems, difficulty opening his mouth, reduced sensation to the left side of his face, headaches, and memory problems. His headaches occur about every other day and are relieved by higher than recommended doses of over-the-counter medications. He has difficulty lifting over 10 pounds because that aggravates the pain. . . .
>
> Emotionally, . . . Syrovy reports feeling "[n]ervous. . . ." He reports long term problems with anxiety dating back about 7 years. . . . He feels anxious every day, for most of the day. He feels he is being watched. He has difficulty going to stores by himself due to his anxiety. He reports feeling shaky, having restless energy, difficulty sleeping, heart palpitations, and sweats. . . .
>
> His current daily activities include helping with household chores, watching television, sitting on the porch, and sleeping. He is independent with his daily hygiene and simple cooking. He assists his [former] wife with household cleaning and the laundry. His former wife completes the shopping because he does not like crowds.

(Administrative Record at 378-79.) Dr. Haban administered a cognitive status screening examination, and found Syrovy to be within the "normal range for temporal orientation

---

[18] *Id.* at 356.

17

and elemental cognitive capacity."[19] Dr. Haban determined that Syrovy's ability to understand, remember, and carry out instructions was not affected by his impairments. Dr. Haban determined, however, that Syrovy's ability to respond appropriately to supervisors, co-workers, and work pressures in a work setting was affected by his impairments. Specifically, Dr. Haban found that Syrovy had slight to moderate restrictions on his ability to interact appropriately with the public and with supervisors. Dr. Haban further found that Syrovy had slight restrictions on his ability to interact appropriately with co-workers and respond appropriately to work pressures in a work setting. Dr. Haban diagnosed Syrovy with anxiety disorder and post-traumatic stress disorder.

On August 16, 2004, Dr. John F. Tedesco, Ph.D., reviewed Syrovy's medical records and provided DDS with Psychiatric Review Technique and mental RFC assessments for Syrovy. On the Psychiatric Review Technique assessment, Dr. Tedesco diagnosed Syrovy with an anxiety disorder. Dr. Tedesco determined that Syrovy had the following limitations: Mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Tedesco determined that Syrovy was moderately limited in his ability to: Understand and remember detailed instructions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. Dr. Tedesco summarized his findings as follows:

> On a mental basis, evidence does not support the existence of marked functional impairments. This conclusion is based on the following observations[: Syrovy] has not sought any

---

[19] *See* Administrative Record at 379.

specific mental health treatment in the recent past. In spite of alleged cognitive deficits in the past, [Syrovy] has been able to work at SGA levels historically. Current CE results do not suggest marked impairments. Marked impairments are not suggested by current activities of daily living based on [Syrovy's] mental condition.

Based on the evidence available, [Syrovy] may experience some moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, and perform activities within a schedule. Similar limitations might apply to his ability to interact with the public and to respond to numerous or rapid changes in the workplace. In most other respects, [Syrovy] should be able to function within broad normal limits.

(Administrative Record at 400.)

On September 29, 2004, Syrovy met with Dr. William Thompson, M.D., for a refill of Clonazepam. Dr. Thompson diagnosed Syrovy with panic attacks. Dr. Thompson noted that Syrovy averaged about five panic attacks each month. Dr. Thompson further noted that Syrovy's panic attacks generally occurred in the middle of the night. Dr. Thompson indicated that Syrovy was able to resolve the panic attacks with deep breathing and walking outside. Dr. Thompson wrote a prescription to refill Syrovy's Clonazepam.

On February 4, 2005, Syrovy met with Dr. Janda. According to Dr. Janda, Syrovy visited him because he needed "an updated letter stating that he has a disability."[20] Dr. Janda noted that he had not seen Syrovy since August 2001. Dr. Janda further noted that in 2001, he felt that Syrovy had a permanent condition of panic attacks and agoraphobia. Dr. Janda concluded that he could not "see where . . . Syrovy could get gainful employment with his present diagnoses of panic attacks with agoraphobia."[21]

---

[20] *See* Administrative Record at 409.

[21] *Id.*; *see also* Administrative Record at 408 (Dr. Janda wrote: "[Syrovy] is still considered permanently disabled for his panic attacks and agoraphobia. [He] cannot
(continued...)

On June 13, 2006, Syrovy met with Dr. Jessica L. Wood, M.D., for a psychiatric diagnostic evaluation.[22] Syrovy reported that his primary problem was with panic attacks. Syrovy indicated that the panic attacks occur three to four times per week and last fifteen to twenty minutes. Dr. Wood noted that Syrovy's panic attacks are characterized by tremors, palpitations, diaphoresis, dyspena, and a fear that he is having a heart attack and is going to die. Syrovy also indicated that although the attacks may occur in any situation, they occur more frequently in public places, particularly in crowds. Dr. Wood noted that Syrovy had not worked in three years because of severe anxiety. Specifically, Dr. Wood noted that:

> [Syrovy] stated that he feels that his coworkers and boss are watching him, he becomes quite nervous and has more difficulties concentrating, so [he] worries that he is making mistakes. These problems appear to result in moderate to severe impairment in ability to relate to others. He stated that he is a "people pleaser" and somewhat sensitive to criticism, so he worries very much that he is doing things properly. He stated that this makes him work slower than others, so that he is unable to keep up and endorsed having difficulties keeping pace even with simple repetitive tasks. He also stated that he has problems understanding directions and often needs verbal instructions repeated to him 3-4 times, [which is] consistent with his report of being in special education throughout school. Because of problems with anxiety, he endorsed severe impairment in ability to adapt to changes and tolerate stress in both work and home environments.

(Administrative Record at 418.) In reviewing his past psychiatric history, Dr. Wood noted that Syrovy "has repeatedly self-discontinued medications because he feels that they have not been working, so it is unlikely he has had an adequate trial of a dosage of medication

---

[21] (...continued)
maintain any job for gainful employment."); Administrative Record at 412 (On June 5, 2006, Dr. Janda completed a "Report on Incapacity" for Linn County, Iowa, and determined that Syrovy was permanently disabled due to severe anxiety, panic attacks, and agoraphobia since 1997).

[22] Dr. Wood's evaluation was reviewed by Dr. Jess G. Fiedorowicz, M.D.

high enough to treat panic disorder."[23] Dr. Wood diagnosed Syrovy with panic disorder with agoraphobia, social anxiety disorder, and probable somatization disorder. Dr. Wood concluded that Syrovy's "symptoms have caused moderate impairment in relating to others, moderate impairment in ability to keep pace at work, and severe impairment in ability to adapt to changes and tolerate stress in both work and home environments."[24] Dr. Wood recommended Lexapro as treatment. Dr. Wood also recommended that Syrovy very slowly taper off and discontinue use of Clonazepam. Dr. Wood further recommended that Syrovy seek psychotherapy and vocational rehabilitation.

Lastly, Dr. Janda provided Syrovy's attorney with a letter, dated July 12, 2006, regarding Syrovy's medical impairments. Dr. Janda diagnosed Syrovy with panic disorder with agoraphobia, social anxiety disorder, and probable somatization disorder. Dr. Janda summarized Syrovy's difficulties as follows:

> [Syrovy] has a complex nature. His somatization disorder can trigger a panic attack characterized by tremors, palpitations, sweating, and shortness of breath that lasts anywhere up to 20 minutes, leaving him mentally disarrayed and emotionally drained. This would make him a liability in any workplace. [His] sensitive nature would not cope well with any criticism, and actually that would only compound the problem. This would trigger poor concentration, irritability, and feeling of social abandonment. In turn, this would lead to poor or minimal productivity.

(Administrative Record at 422.) Dr. Janda concluded that Syrovy's "psychiatric conditions preclude him from acquiring gainful employment."[25]

---

[23] *See* Administrative Record at 419.

[24] *See* Administrative Record at 420.

[25] *Id*. at 422.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Syrovy is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590-91 (citing *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir. 2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or

her] limitations.'" *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).

The ALJ applied the first step of the analysis and determined that Syrovy had not engaged in substantial gainful activity since his alleged onset date, January 1, 1997. At the second step, the ALJ concluded that Syrovy had the following impairment "Anxiety Disorder NOS." At the third step, the ALJ found that Syrovy did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. [§] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments)]." At the fourth step, the ALJ determined Syrovy's RFC as follows:

> [Syrovy] has the residual functional capacity to perform the nonexertional work-related activities except that he can perform no more than simple, routine tasks with only occasional changes in the routine work setting and the occasional need for independent decision-making. He can only occasionally work at a production rate pace, defined as strict quotas or timeframes. He can occasionally interact with the public. There are no exertional limitations.

The ALJ determined that Syrovy had no past relevant work. At the fifth step, the ALJ determined that Syrovy, based on his age, education, work experience, and RFC, could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Syrovy was "not disabled."

### B. Whether the ALJ Properly Considered the Evidence

Syrovy contends that the ALJ erred in three respects. First, Syrovy argues that the ALJ erred by failing to fully consider the opinions of his treating physician, Dr. Janda, with regard to his panic attack disorder. Next, Syrovy argues that the ALJ failed to include all of his impairments in the hypothetical questions presented to the vocational expert at the administrative hearings. Lastly, Syrovy argues that his "unpredictable moderate to severe panic attacks and agorophobia [sic] make him unable to do substantial gainful employment

on a regular basis in the everyday competitive world, and no jobs exist for [him], despite his attempts to obtain employment."[26]

### 1. Dr. Janda's Opinions

Syrovy argues that the ALJ improperly discounted Dr. Janda's opinion that he is permanently disabled and "has functional limitations for maintaining a job due to [the] unpredictable nature of his panic disorders."[27] Syrovy argues that in discounting Dr. Janda's opinion, the ALJ placed too much weight on the opinion of Dr. Haban, a consultative examining source. Syrovy also argues that the ALJ improperly concluded that his activities of daily living were inconsistent with Dr. Janda's opinions. Specifically, Syrovy asserts that:

> he may be able to do all sorts of daily activities in isolation and without the stress and strain of a workplace environment, but his agoraphobia and panic attacks make it impossible for him to be available to work under the stress of the normal work environment.

(Syrovy's Brief at 6.) Syrovy concludes that Dr. Janda's opinions are consistent with the other objective medical evidence contained in the record as a whole; therefore, the ALJ improperly discounted Dr. Janda's opinion.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

---

[26] *See* Syrovy's Brief at 10.

[27] *See* Administrative Record at 422.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(I). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh*, 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id*. "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson*, 361 F.3d at 1070 (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

In discussing Dr. Janda's opinions, the ALJ noted:

> [Dr. Janda] said that [Syrovy] had requested a letter stating that he was disabled because of mental problems. . . . It is significant, however, that the physician indicated he had not seen [Syrovy] since August 2001 (four years). This being the case, the undersigned will not give his assessment or opinion any weight with regard to [Syrovy's] disability. In any event, the record is devoid of any reports of clinical or laboratory testing [Dr. Janda] may have performed to support his

conclusions concerning [Syrovy's] panic attacks limitations;
therefore [Dr. Janda's opinion] deserves little weight.

(Administrative Record at 22.) The ALJ also found Dr. Janda's opinions inconsistent with the opinions of Dr. Haban and Drs. Wood and Fiedorowicz. The ALJ noted that Dr. Haban found Syrovy had slight to moderate restrictions on his ability to interact appropriately with the public and with supervisors and slight restrictions on his ability to interact appropriately with co-workers and respond appropriately to work pressures in a work setting. The ALJ also noted that Drs. Wood and Fiedorowicz found Syrovy was moderately impaired in his ability to related to other people and keep pace with his work. The ALJ concluded that the opinions of Drs. Haban, Wood, and Fiedorowicz, and the medical evidence as a whole, suggested that Syrovy had some mental limitations which could preclude higher skilled jobs, but he would not be unable to perform all unskilled work. The ALJ further pointed out that since his declared disability onset date, Syrovy worked as a garbage collector, actively sought employment, and stopped working in 2005 for reasons other than his impairments. Lastly, the ALJ noted that Syrovy "reported no problems in performing normal activities of daily living[, such as cooking, doing laundry, and going grocery shopping.] As such, the undersigned notes that the performance of these is not inconsistent with the performance of many of the basic activities of work."[28]

Having reviewed the entire record, the Court finds that there is substantial evidence in the record as a whole which supports the ALJ's determination to give little weight to Dr. Janda's opinion that Syrovy is incapable of working due to his panic attack disorder. *See Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability."); *see also Singh*, 222 F.3d at 452 (a treating physician's opinion is afforded significant weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."). Furthermore, the Court finds that the ALJ provided good reasons for granting little weight to Dr. Janda's opinions, and the ALJ's reasons are supported by substantial evidence in the

---

[28] *See* Administrative Record at 23.

record as a whole. *See Vester*, 416 F.3d at 889. Even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## 2. *The ALJ's Hypothetical Questions*

Syrovy argues that the ALJ failed to include all of his limitations in the hypothetical questions posed to the vocational expert. Specifically, Syrovy argues that the ALJ failed to include the limiting effects his unexpected panic attacks would have on his ability to find competitive employment. Syrovy claims that he has three to four panic attacks which last for at least twenty minutes each week. Thus, Syrovy maintains that "without a specific, precise finding as to the frequency and intensity of the panic attacks [by the ALJ], there is no basis in this record for any hypothetical to the vocational expert, providing substantial evidence that jobs exist for [Syrovy] to do."[29]

Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). However, the ALJ does not need to include all impairments that are suggested by the evidence. *Goff*, 421 F.3d at 794. The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the

---

[29] *See* Syrovy's Brief at 9. In summary, Syrovy argues that:

> [A]bsent a finding as to precisely what extent [Syrovy] has unexpected panic attacks and then an inclusion of this information in the hypothetical question asked [to] the [vocational expert], the [vocational expert's] answer to an incomplete hypothetical cannot serve as evidence that jobs exist that [Syrovy] can do, and cannot support a finding of not disabled.

*Id.*

impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985).").

At the hearing, the ALJ asked the vocational expert five different hypothetical questions. Under the various hypotheticals, Syrovy was limited to: (1) Working at simple, routine tasks; (2) occasional changes in the work setting; (3) occasional independent decisions; (4) occasional production rate pace; (5) occasional interaction with the public; (6) missing one day of work per month due to panic attacks; (7) no changes in the work setting; (8) no independent decisions; (9) no interaction with the public; (10) occasional interaction with co-workers and supervisors; (11) sedentary work; and (12) an inability to sustain an eight-hour workday. Having reviewed the entire record, the Court finds that the limitations provided in the five hypotheticals adequately address the effect Syrovy's panic attack disorder would have on his ability to find competitive full-time employment. The Court further determines that the ALJ's hypothetical questions captured the concrete consequences of Syrovy's limitations and included the impairments which were substantially supported by the record as a whole. *See Hunt*, 250 F.3d at 625; *Goose*, 238 F.3d at 985.

### 3. *Substantial Gainful Employment*

Syrovy argues that "[his] unpredictable moderate to severe panic attacks and agorophobia [sic] make him unable to do substantial gainful employment on a regular basis in the everyday competitive world, and no jobs exist for [him], despite his attempts to obtain gainful employment."[30] Syrovy further argues that "unexpected panic attacks, supported by a treating physician's opinions, justify a finding of disabled, despite [his] ability to in isolation carry out day-to-day tasks."[31] In his third argument ("Brief Point III"), Syrovy essentially incorporates the same arguments discussed in *V.B.1* and *V.B.2*. Therefore, since it has already been determined that the ALJ properly considered the medical evidence in the record, including Dr. Janda's opinions, and adequately considered

---

[30] *See* Syrovy's Brief at 10.

[31] *Id*. at 11-12.

and addressed the effect of Syrovy's panic attack disorder on his ability to find employment, the Court determines that the ALJ's decision finding Syrovy not disabled and functionally capable of performing work that exists in significant numbers in the national economy is supported by substantial evidence on the record as a whole. *See Vester*, 416 F.3d at 889.

## VI. CONCLUSION

The Court finds that the ALJ properly considered the medical evidence in the record, including Dr. Janda's opinions and the effect Syrovy's panic attack disorder has on his ability to find competitive full-time employment. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1.    The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.    Plaintiff's Complaint (docket number 4) is **DISMISSED** with prejudice; and

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this 5th day of June, 2008.

JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA